IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | | |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| **ACE MOTOR ACCEPTANCE CORPORATION,** | ) ) ) ) | Case No. 18-30426 |
| Debtor. | ) ) | |
| **THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ACE MOTOR ACCEPTANCE CORP., ON BEHALF OF ACE MOTOR ACCEPTANCE CORP., Debtor-in-Possession,** | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Adversary Proceeding No.: 19-3019 |
| **RUSSELL E. ALGOOD, as the Trustee of the Russell E. Algood Revocable Trust dated May 15, 2013, MALVIN L. ALGOOD, as the Trustee of the Malvin L. Algood Living Trust, MALVIN L. ALGOOD, as the Trustee of the Janet G. Algood Living Trust, JOHN G. ALGOOD, as the Trustee of the John G. Algood Living Trust, STEVEN A. COOK, SHIRLEY A. COOK KARCH, as the Trustee of the Shirley A. Cook Declaration of Trust dated April 9, 2013, JEFFREY ALGOOD, STUART ALGOOD, PAULINE WILLIAMS, and DONALD EUGENE BROWN,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF RUSSELL E. ALGOOD

Pursuant to 28 U.S.C. § 1746, I, Russell E. Algood, declare as follows:

1. I am over 18 years of age, of sound mind, and am capable of testifying to the facts contained in this declaration. I make this declaration based on my personal knowledge.

2. I make this declaration in support of the *Motion for Summary Judgment* filed by the Russell Edward Algood Revocable Trust Dated May 15, 2013, the Janet G. Algood Living Trust, the John G. Algood Living Trust, and the Malvin L. Algood Living Trust (collectively, the "Movants").

3. I am the president and a shareholder of Ace Motor Acceptance Corporation (the "Debtor"), which filed for protection under Chapter 11 of the United States Bankruptcy Code on March 15, 2018 (the "Petition Date").

4. I and other members of my family made loans to the Debtor at various points in time since the formation of the company in 1998. Our interests in these loans were subsequently transferred to trusts that we settled for estate planning purposes. In some cases, the trusts made additional loans to the Debtor as well. The loans were documented with promissory notes or loan agreements, security agreements, and financing statements. Additionally, these transactions were at all times reflected in the Debtor's books and records, in its tax returns, and in its audited financial statements as loans.

5. I was personally involved in the formation of all the trusts that are the Movants in this matter. I am also familiar with the terms and provisions of the applicable trust instruments and the trusts' lending transactions with the Debtor.

*The Debtor's Equity Ownership Structure*

6. The Debtor was initially incorporated in August of 1998 as Ace Financial Services, Inc. At the time of its incorporation, I owned all of the Debtor's outstanding stock. The Debtor changed its name to Ace Motor Acceptance Corporation in the fall of 2003.

7. In early 2003, Shirley Cook, the John G. Algood Living Trust, and the Janet G. Algood Living Trust purchased stock in the Debtor. The following parties held all of the Debtor's outstanding equity interests as of these purchases:

| **Shareholder** | **Percentage of Total Shares** |
| --- | --- |
| Russell Algood | 77.220% |
| Janet G. Algood Living Trust | 12.870% |
| John G. Algood Trust | 7.722% |
| Shirley Cook | 2.188% |
| Total | 100% |

8. The corporate ownership and share distribution percentages in the Debtor remained the same from 2003 until 2007, when John Troxell exercised certain stock options he previously acquired. From 2007 through 2009, the Debtor's outstanding equity interests were owned as follows:

| **Shareholder** | **Percentage of Total Shares** |
| --- | --- |
| Russell Algood | 74.349% |
| Janet G. Algood Living Trust | 12.392% |
| John G. Algood Trust | 7.435% |
| John Troxell | 3.717% |
| Shirley Cook | 2.107% |
| Total | 100% |

9. Janet Algood, my mother, passed away on December 16, 2003.

10. During 2011, shares were issued to additional stockholders. Then, in 2013 or 2014, the Debtor reissued the Janet G. Algood Living Trust certificates to my father, Malvin L. Algood. This step was taken due to concerns that the Janet Algood Trust could no longer own stock certificates since Janet Algood was deceased. These changes resulted in the current ownership structure for the Debtor's equity interests:

| Shareholder | Percentage of Total Shares |
| --- | --- |
| Russell Algood | 67.57% |
| Malvin L. Algood | 11.26% |
| John G. Algood Trust | 8.78% |
| Shirley Cook | 3.38% |
| Wayne Garland | 2.48% |
| Stuart Algood | 1.69% |
| Jeff Algood | 1.69% |
| David Algood | 2.14% |
| Ben Collison | 1.01% |
| Total | 100% |

11. At various points since 1998, the Debtor paid profit dividends to its owners consistent with each shareholder's equity stake in the company. The Debtor reflected each distribution on its books and records, in its tax returns, in its audited financial statements, and in Form K-1s provided to the stockholders for preparation of their personal tax returns.

12. These distributions to shareholders were unrelated to any payments of principal or interest made by the Debtor to the Movants on the loans referenced above. All such payments of

principal or interest were instead made according to the terms of the applicable loan at issue, rather than the particular lender's ownership interest in the Debtor (if any).

*The Disputed Loan Transactions*

13. As mentioned above, I and other members of my family (or trusts that we established) provided loans to the Debtor to help fund its operations beginning as far back as 1998. These loans were treated as ongoing lines of credit and were evidenced by written agreements or promissory notes, were secured by the Debtor's assets, were accounted for in the Debtor's books and records as loans, were included as debts in the Debtor's tax returns, and were included as loans in the Debtor's financial statements.

14. The Debtor never exchanged corporate management or control rights to any lender in return for these loans.

15. Certain of the loan agreements and related papers were prepared without the assistance of legal counsel. However, efforts were made to formally document the loans and to keep an accurate accounting of the amounts loaned by, and owed to, the particular lenders.

16. The Debtor made regular, monthly payments of interest to the lenders as provided by their loan agreements, and issued Form 1099 interest income statements annually to the lenders for tax reporting purposes. While these loans were subordinated by agreement to the Debtor's senior secured lender when required, they were not subordinated to any other claims against the Debtor.

17. The history of each of the Movants' loans is discussed in turn below.

*Loans Related to Malvin L. Algood and the Malvin Trust*

18. My father, Malvin L. Algood, made loans to the Debtor in his individual capacity beginning in 1998. On November 2, 1998, the Debtor executed two promissory notes to Malvin

L. Algood (the "1998 Malvin Notes"). True and accurate copies of the 1998 Malvin Notes are attached hereto as **Exhibit A**.

19. Both of the 1998 Malvin Notes were for the principal balance of $1,000,000.00 and both were payable on demand. The first of these notes bore interest at the prime rate through May 1, 1999, at which time its interest rate adjusted to 5% per year. The second bore interest at the prime rate. Accrued interest due under each of the 1998 Malvin Notes was "due and payable on the first day of each month commencing the date of this promissory note."

20. Malvin L. Algood funded $1,100,000.00 under the 1998 Malvin Notes from 1999 to 2004. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

21. In addition to the 1998 Malvin Notes, the Debtor also executed a commercial security agreement in favor of Malvin L. Algood on November 2, 1998 (the "Malvin Security Agreement"). A true and accurate copy of the Malvin Security Agreement is attached hereto as **Exhibit B**. The Malvin Security Agreement granted a blanket security interest in all assets of the Debtor, to secure the "Indebtedness." "Indebtedness" was defined as "the indebtedness evidenced by the Note, including all principal and interest, together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or other related documents."

22. My father attempted to perfect his security interest in the Debtor's assets during March of 1999 through the filing of a financing statement bearing file number 199902923 in the public registry of Mecklenburg County, North Carolina. While the original document could not be located, an abstract from the website of the Mecklenburg County Register of Deeds showing this attempted filing is attached hereto as **Exhibit C**.

23. On or about September 30, 1999, my father settled the Malvin L. Algood Living Trust (the "Malvin Trust"). The Malvin Trust is revocable and is for the benefit of my father during his lifetime. My father also serves as the trustee during his lifetime. At my father's death, sub-trusts are created under the Malvin Trust for the benefit of my mother. The Malvin Trust further provides that upon the death of both my father and my mother, any remaining trust property is to be distributed to their children and grandchildren in certain shares.

24. The Malvin Trust instrument states that the trust may be funded with property interests of all kinds, whether by conveyance, assignment, or transfer.

25. After its formation, my father advised the Debtor that his interests in the 1998 Malvin Notes and the Malvin Security Agreement were to be treated as property of the Malvin Trust. The Malvin Trust then perfected its security interests by filing a financing statement bearing file number 20030064991F with the North Carolina Secretary of State. A true and accurate copy of the 2003 Malvin Trust UCC is attached hereto as **Exhibit D**.

26. On May 1, 2006, the Debtor issued an additional promissory note payable to the demand of the Malvin Trust in the amount of $100,000.00 (the "2006 Malvin Trust Note"). A true and accurate copy of the 2006 Malvin Trust Note is attached hereto as **Exhibit E**. The 2006 Malvin Trust Note was a demand note bearing interest "at a variable per annum rate equal to the prime rate as listed in the Wall Street Journal on the first business day of each month."

27. The Malvin Trust funded $100,000.00 in 2006 under the 2006 Malvin Trust Note. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

28. Like the 1998 Malvin Notes, the 2006 Malvin Note was secured by substantially all of the Debtor's assets. An additional financing statement bearing file number 20080042213C

was filed on May 6, 2008 (the "2008 Algood UCC") listing Malvin Algood, the Malvin Trust, the Janet Trust, and Russell Algood as secured parties. A true and accurate copy of the 2008 Algood UCC is attached hereto as **Exhibit F**.

29. The Malvin Trust advanced another $200,000.00 in 2008, $250,000.00 in 2010, and $300,000.00 in 2012 to the Debtor. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

30. On November 21, 2014, the Debtor executed two loan agreements payable to the order of the Malvin Trust (the "2014 Malvin Trust Loans"). True and accurate copies of the 2014 Malvin Trust Loans are attached hereto as **Exhibit G**. One was in the principal amount of $1,125,000.00. The other was in the in the principal amount of $1,100,000.00.

31. The 2014 Malvin Trust Loans were restatements of the debts initially created in favor of Malvin L. Algood personally (and evidenced by the 1998 Malvin Notes) combined with the debt evidenced by the 2006 Malvin Trust Note and the additional advances made from 2008 to 2012. The Debtor entered into the 2014 Malvin Trust Loans, in part, to clarify that my father had transferred his rights under the 1998 Malvin Notes to the Malvin Trust after issuance of the original notes.

32. The 2014 Malvin Trust Loans were payable at the demand of the Malvin Trust. The loan in the principal amount of $1,125,000.00 bore interest at the rate of 9% per year "or such lesser rate on which the parties mutually agree (Currently 5.25%)." The other loan bore interest at the rate of 5% per year. Both agreements called for the Debtor to pay accrued interest on or before the twentieth day of each month.

33. The stated purpose of the 2014 Malvin Trust Loans was to allow the Debtor to purchase retail installment contracts and provide floor plans to independent automobile dealers. The loan agreements further provided that the outstanding balances were secured by the Debtor's receivables, inventory, computer systems, and furniture. The Malvin Trust perfected its security interest by filing a financing statement with the North Carolina Secretary of State bearing file number 20140070967H (the "2014 Algood UCC").[1] A true and accurate copy of the 2014 Algood UCC is attached hereto as **Exhibit H**.

34. The Malvin Trust advanced another $275,000.00 to the Debtor in fiscal year 2015.[2] The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

35. The Debtor entered into a final loan agreement with the Malvin Trust on November 1, 2016 (the "2016 Malvin Trust Loan"). A true and accurate copy of the 2016 Malvin Trust Loan is attached hereto as **Exhibit I**. The 2016 Malvin Trust Loan was in the amount of $500,000.00 and was payable on demand. The 2016 Malvin Trust Loan contained a stated annual interest rate of 12%, which was adjustable by agreement of the parties.

36. The Malvin Trust funded $500,000.00 under the 2016 Malvin Trust Loan in calendar year 2016. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

37. The 2016 Malvin Loan was perfected by the 2014 Algood UCC.

---

[1] The 2014 Algood UCC perfects a number of loans, and lists the following secured parties: Malvin Algood, Russell Algood, the Janet Trust, and the Malvin Trust.

[2] The Debtor utilized a fiscal year that coincided with the calendar year through 2011. In 2012, the Debtor switched to a fiscal year ending on September 30 of each calendar year. In this Declaration, I have specified whether events occurred in the fiscal or the calendar year, where there is a difference between the two.

38. The Debtor owed the Malvin Trust $2,731,910.62 in principal and accrued interest under the foregoing loan agreements as of the Petition Date.

*Loans Related to Janet G. Algood and the Janet Trust*

39. The Debtor executed a promissory note to Janet Algood on November 16, 1999 in the principal sum of $1,000,000.00, which note was payable on demand (the "1999 Janet Note"). The 1999 Janet Note bore interest "at a variable per annum rate equal to the prime rate of interest as listed by the Wall Street Journal on the first business day of each month (the 'Prime Rate')." All accrued interest under the 1999 Janet Note was "due and payable on the first day of each month commencing the date of this promissory note." A true and accurate copy of the 1999 Janet Note is attached hereto as **Exhibit J**.

40. However, on or about September 30, 1999 my mother settled the Janet G. Algood Living Trust (the "Janet Trust"). The Janet Trust was revocable and was for the benefit of my mother during her lifetime. My father serves as the trustee during his lifetime. At my mother's death, sub-trusts are created under the Janet Trust for the benefit of my father. The Janet Trust further provides that upon the death of both my father and my mother, any remaining trust property is to be distributed to their children and grandchildren in certain shares.

41. The Janet Trust instrument states that the trust may be funded with property interests of all kinds, whether by conveyance, assignment, or transfer.

42. Contemporaneously with the 1999 Janet Note, the Debtor executed a commercial security agreement (the "1999 Janet Trust Security Agreement"). The 1999 Janet Trust Security Agreement references a loan dated November 16, 1999 in the principle amount of $1,000,000.00, but identifies the lender as the Janet Trust. The 1999 Janet Trust Security Agreement granted the Janet Trust a security interest in all contracts receivable, cash, bank accounts, computers,

furniture, and vehicles of the Debtor. A true and accurate copy of the 1999 Janet Trust Security Agreement is attached hereto as **Exhibit K**.

43. The Janet Trust filed a corresponding financing statement with the North Carolina Secretary of State bearing file number 19990119830 (the "1999 Janet Trust UCC"). A true and accurate copy of the 1999 Janet Trust UCC is attached hereto as **Exhibit L**.

44. The Janet Trust funded $900,000.00 under the 1999 Janet Note and 1999 Janet Trust UCC in 1999 and 2000. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records. In 2000, the Debtor repaid the entire principal balance of the 1999 Janet Note, and the Janet Trust accordingly filed a statement terminating the 1999 Janet Trust UCC (the "Termination Statement"). A true and accurate copy of the Termination Statement is attached hereto as **Exhibit M**.

45. Subsequently, the Debtor executed an additional promissory note payable to the Janet Trust in the principal sum of $1,000,000.00 on December 1, 2000 (the "2000 Janet Trust Note"). A true and accurate copy of the 2000 Janet Trust Note is attached hereto as **Exhibit N** and incorporated by reference as if fully set forth herein.

46. The Debtor also executed a new commercial security agreement in favor of the Janet Trust (the "2000 Janet Trust Security Agreement"). A true and accurate copy of the 2000 Janet Trust Security Agreement is attached hereto as **Exhibit O**. The 2000 Janet Trust Security Agreement references a loan dated December 1, 2000 in the principal amount of $1,000,000.00, and grants the Janet Trust a security interest in all the Debtor's contracts receivable, cash, bank accounts, computers, furniture, and vehicles.

47. The Janet Trust perfected its security interest by filing a financing statement bearing file number 20000123849 (the "2000 Janet Trust UCC"). A true and accurate copy of the 2000 Janet Trust UCC is attached hereto as **Exhibit P**.

48. The Janet Trust funded $200,000.00 under the 2000 Janet Trust Note to the Debtor in 2000, and another $500,000.00 in 2001. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

49. On November 21, 2014, the Debtor executed a new loan agreement payable at the demand of the Janet Trust in the principal sum of $600,000.00 (the "2014 Janet Trust Loan Agreement"). A true and accurate copy of the 2014 Janet Trust Loan Agreement is attached hereto as **Exhibit Q** and incorporated by reference as if fully set forth herein. The 2014 Janet Trust Loan Agreement bore interest at the rate of 9% per year "or such lesser rate on which the parties mutually agree (Currently 5.25%)." The agreement called for the Debtor to pay accrued interest "on or before the twentieth day of each month." The 2014 Janet Trust Loan Agreement further provided that substantially all of the Debtor's assets secured the outstanding balance. The 2014 Algood UCC listed the Janet Trust as an additional secured party.

50. The Debtor and the Janet Trust intended for the 2014 Janet Trust Loan Agreement to restate the debt initially created by the earlier 2000 Janet Trust Note. The principal sum of the loan stated in the 2014 Janet Trust Loan Agreement was reduced to reflect the amount of the financing extended to the Debtor by the Janet Trust under the earlier note, less a $100,000.00 principal repayment made by the Debtor in 2004.

51. As of the Petition Date, the Debtor owed the Janet Trust $601,072.58 in principal and accrued interest under the 2014 Janet Trust Loan Agreement.

*Loans Related to Russell E. Algood and the Russell Trust*

52.     I also loaned money to the Debtor in 1998 under a promissory note executed by the Debtor (the "1998 Russell Note"). Unfortunately, I have been unable to locate a copy of the 1998 Russell Note. It was identical in form to the 1998 Malvin Notes and the 2000 Janet Note. The 1998 Russell Note was in the principal amount of $1,000,000.00 and was payable on demand.

53.     In connection with the 1998 Russell Note, the Debtor also executed a security agreement, which granted me a security interest in substantially all of the Debtor's assets (the "1998 Russell Security Agreement"). A true and accurate copy of the 1998 Russell Security Agreement is attached hereto as **Exhibit R**. I attempted to perfect this security interest in the Debtor's assets during March of 1999 by filing of a financing statement bearing file number 199902924 in the public registry of Mecklenburg County, North Carolina. While the original document could not be located, an abstract from the website of the Mecklenburg County Register of Deeds showing this attempted filing is attached hereto as **Exhibit S**. When I believed the initial financing statement filed with the Mecklenburg County Register of Deeds was going to expire, I filed a financing statement with the North Carolina Secretary of State bearing file number 20030064921J (the "2003 Russell UCC"). A true and accurate copy of the 2003 Russell UCC is attached hereto as **Exhibit T**.

54.     I personally loaned the company in excess of $1,500,000.00 between 1998 and 2007. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

55. The Debtor repaid portions of the principal I loaned in 1999, 2000, 2002 and 2003. After these repayments of principal, the outstanding principal balance of my loan to the Debtor totaled $1,055,000.00 as of the end of the year in 2007.

56. On April 1, 2008, the Debtor executed another promissory note payable to me in the principal sum of $2,000,000.00, which note was payable on demand (the "2008 Russell Note"). The principal balance of the 2008 Russell Note reflected the advances I already made to the Debtor under the 1998 Russell Note, as well as additional amounts in excess of $150,000.00 that I advanced in 2008. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records. A true and accurate copy of the 2008 Russell Note is attached hereto as **Exhibit U**.

57. The 2008 Russell Note bore interest at 9% per year. All accrued interest under the 2008 Russell Note was due and payable to me on the last date of each subsequent month. The 2008 Russell Note further stated that it was secured by all assets of the Debtor, including but not limited to contracts receivable and cash. This security interest was perfected by the filing of the 2008 Algood UCC on May 6, 2008.

58. The principal amount of the 2008 Russell Note also reflected the parties' expectation that I would be loaning additional funds to the Debtor in the future. After execution of the 2008 Russell Note, I loaned the Debtor in excess of $500,000.00 from 2009 to 2013. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records. The Debtor also made repayments of principal on the 2008 Russell Note in 2008 and 2010. At the conclusion of the 2013 fiscal year, the total outstanding balance under the 2008 Russell Note was $1,700,000.00.

59.     On May 15, 2013, I settled the Russell Edward Algood Revocable Trust Dated May 15, 2013 (the "Russell Trust"). I am the trustee of the Russell Trust, and am authorized under its terms to use the trust property for the benefit of myself, my spouse, and my children. At my death, sub-trusts are created under the Russell Trust for the benefit of my spouse and my children. The Russell Trust states that I or any other person can make contributions to the trust by gift, will, or otherwise.

60.     On November 21, 2014, the Debtor executed a loan agreement in favor of the Russell Trust in the principal sum of $1,850,000.00 (the "2014 Russell Trust Loan"). A true and accurate copy of the 2014 Russell Trust Loan is attached hereto as **Exhibit V**. The 2014 Russell Trust Loan was payable on demand and bore interest at the rate of 9% per year "or such lesser rate on which the parties mutually agree." The agreement called for the Debtor to pay accrued interest "on or before the twentieth day of each month." The purpose of the loan was to allow the Debtor to purchase retail installment contracts and to provide floor plans to independent automobile dealers.

61.     The 2014 Russell Trust Loan agreement stated that the outstanding balance was secured by substantially all of the Debtor's assets. It was my intent to perfect the Russell Trust's security interest with the filing of the 2014 Algood UCC, although that document listed me as an additional secured party rather than the Russell Trust specifically.

62.     The Debtor and I, both individually and as trustee, intended for the 2014 Russell Trust Loan agreement to restate the debts initially created by the 1998 Russell Note and the 2008 Russell Note (such that the payee would be the Russell Trust rather than me).

63.     The 2014 Russell Trust Loan was also intended to cover additional financing that the Russell Trust anticipated extending to the Debtor in the future. After execution of the 2014

Russell Trust Loan, the Russell Trust advanced another $300,000.00 to the Debtor in fiscal year 2015. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

64. The Debtor entered into a final loan agreement with the Russell Trust on November 17, 2016 by executing another, updated loan agreement (the "2016 Russell Trust Loan"). A true and accurate copy of the 2016 Russell Trust Loan is attached hereto as **Exhibit W**.

65. The 2016 Russell Loan was in the amount of $200,000.00 and was payable on demand. The 2016 Russell Loan contained a stated annual interest rate of 12%, which was adjustable by the agreement of the parties. The 2016 Russell Loan also granted the Russell Trust a security interest in substantially all of the Debtor's assets, which interest was perfected by filing a financing statement bearing file number 20160112038F (the "2016 Algood UCC").[3] A true and accurate copy of the 2016 Algood UCC is attached hereto as **Exhibit X**.

66. After execution of the 2016 Russell Trust Loan, the Debtor repaid the Russell Trust $40,000.00 in outstanding principal. The Russell Trust then advanced another $90,000.00 to the Debtor in calendar year 2016. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

67. The Debtor owed the Russell Trust $2,055,428.76 in principal and accrued interest under the foregoing loan agreements as of the Petition Date.

---

[3] The 2016 Algood UCC perfects several lenders' security interests and lists the following secured parties: the John Trust, the Russell Trust, and Steven Cook.

*Loans Related to John G. Algood and the John Trust*

68. My brother, John G. Algood, settled the John G. Algood Living Trust on or about February 2, 2000 (the "John Trust"). My brother is the trustee of the John Trust, which is revocable and for his benefit during his lifetime. At his death, sub-trusts are created under the John Trust for the benefit of his spouse and children. The John Trust states that my brother may fund the trust with property interests of all kinds by conveyance, assignment, or transfer of property.

69. The John Trust loaned the Debtor $100,000.00 in 2001 without security, which the Debtor repaid in 2003. The John Trust then loaned the Debtor $60,000.00 in 2009 and $100,000.00 in 2010 on an unsecured basis. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records. However, if notes or debentures were executed in connection with these loans, the Debtor, my brother, and I have been unable to locate them.

70. On November 21, 2014, the Debtor executed a loan agreement payable to the John Trust in the principal sum of $250,000.00 or such other amount as might be loaned from time to time (the "2014 John Trust Loan"). A true and accurate copy of the 2014 John Trust Loan is attached hereto as **Exhibit Y**.

71. The loan described therein was payable at the demand of the lender. The loan bore interest at the rate of 9% per year "or such lesser rate on which the parties mutually agree (Currently 5.25%)." The loan agreement called for the Debtor to pay accrued interest "on or before the twentieth day of each month." The stated purpose of the loan was to allow the Debtor to purchase retail installment contracts and to provide floor plans to independent automobile

dealers. The loan agreement further provided that the outstanding balance was secured by the Debtor's receivables, vehicle inventory, computer systems, and furniture.

72. Shortly after execution of the 2014 John Trust Loan, the John Trust funded an additional $75,000.00 to the Debtor in calendar year 2014. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records.

73. The John Trust loaned an additional $250,000.00 to the Debtor in October of 2016. The Debtor received these funds, used them to meet operating expenses and debt service payments, and accounted for them as loans in its books and records. Accordingly, the Debtor entered into another loan agreement with the John Trust on November 1, 2016 (the "2016 John Trust Loan"). A true and accurate copy of the 2016 John Trust Loan is attached hereto as **Exhibit Z**.

74. The 2016 John Trust Loan was payable on demand and had a principal balance of $250,000.00. The 2016 John Trust Loan contained a stated annual interest rate of 12%, which was adjustable by agreement of the parties. The 2016 John Trust Loan also granted the John Trust a security interest in substantially all of the Debtor's assets, which interest was perfected by the filing of the 2016 Algood UCC with the North Carolina Secretary of State.

75. As of the Petition Date, the Debtor owed the John Trust $486,384.48 in principal and accrued interest under the 2014 John Trust Loan and the 2016 John Trust Loan.

*Availability of Historical Records*

76. Certain of the loans at issue in this litigation date back to 1998. The Debtor did not retain decades worth of bank statements, and some of the older promissory notes and related documentation could not be located as referenced above. I did inquire with the bank where the

Debtor maintained its accounts for most of its history in the late spring of 2018, to determine if historical bank records could be obtained.  Only the past few years of statements were available from the bank.

77. The Debtor also migrated to its existing accounting management software package, Microsoft Dynamics Great Plains ("Great Plains"), in 2012.  As part of this migration, the Debtor imported certain of its accounting records extending back to December 31, 2009 into the Great Plains database from the Debtor's prior accounting software.  While the accounting data imported into Great Plains was current as of that time, it is not possible to produce detailed, historical ledgers and reports for prior years unless they happened to be retained in hard copy format within the company's records.

78. However, it was always the Debtor's regular business practice to reconcile the cash account ledger entries in its books and records to its corporate bank account statements each and every month.  As a result, the Debtor maintained an ongoing record of the funds it received and disbursed in the course of its operations, including the proceeds of the loans at issue in this matter and all related principal or interest payments to the lenders.

79. This information, in turn, was provided to the Debtor's outside accountants each year, who reviewed the status of the loans and their outstanding balances when preparing audited or review level financial statements.  The accountants' work included, for example, tying out the company's cash balances (*i.e.*, verifying the Debtor's cash flows) on an annual basis, in addition to performing "mark to market" accounting to ensure that receivables were valued accurately after consideration of factors like bad debts or discounts offered to customers.

80. The Debtor's annual financial statements as prepared by its accountants are therefore the most accurate historical records available of the company's finances and the Movants' loans, particularly for time periods preceding 2009.

81. Since its incorporation in 1998, no creditor of the Debtor (including, but not limited to, the Movants) has ever required the establishment of a sinking fund to repay its debt.

82. Exhibits A through Z of this declaration are incorporated herein by reference as if fully set forth.

I certify under penalty of perjury, this 10th day of October, 2019, that the foregoing is true and correct.

*/s/ Russell E. Algood*
_____
Russell E. Algood